### 74655. APPLING v. HOME FEDERAL SAVINGS & LOAN ASSOCIATION OF ROME.
(364 SE2d 91)

CARLEY, Judge.

In 1962, appellant-plaintiff (hereinafter referred to as Mrs. Appling) and her husband obtained a twenty-year home loan from appellee-defendant (hereinafter referred to as the S & L). In 1964, the S & L sent a general mailing to its customers, including Mrs. Appling and her husband, concerning the availability of mortgage life insurance. Mrs. Appling's husband applied for the insurance and, pursuant to his application, Security Life and Trust Company issued a decreasing term policy which insured his life. The policy that was issued named the S & L as the beneficiary and contained provisions to the effect that the "initial amount of loan insured" was $10,000 and that the benefits were "to be applied by [the S & L] first toward payment of the loan. . . ." Although the policy was issued for an eighteen-year term, the payment of premiums was required for only fifteen years. Thus, no premiums would be necessary to keep the policy in force and effect for such declining coverage as would be available during the final three years of its eighteen-year term. On September 25, 1964, the S & L wrote to Mrs. Appling's husband to notify him that the policy had been issued and would be placed in his loan file "unless [the S & L was] otherwise notified . . ." When the S & L was not otherwise notified, it accordingly retained possession of the policy. Thereafter, the premiums for the policy were sent by Mrs. Appling and her husband directly to the S & L each month and the S & L forwarded the payments to the insurance company.

The loan from the S & L was paid off by Mrs. Appling and her

husband in 1977, five years earlier than scheduled. At this time, five years of the insurance policy's original eighteen-year term remained and there was approximately $4,290 of coverage then available under the policy. Mrs. Appling asked an employee of the S & L if the insurance policy on her husband's life could be maintained notwithstanding the pay-off of the loan. The S & L employee informed Mrs. Appling that it would be possible to keep the policy in effect by continuing to make premium payments.

Mr. and Mrs. Appling elected to keep the policy in effect and they continued to send a monthly premium payment to the S & L. The S & L, in turn, continued to forward the premium payments to the insurance company until 1979, the year which marked the end of the fifteen-year period during which the payment of premiums was required. However, the S & L did not undertake to inform Mrs. Appling and her husband that, under the terms of the policy, premium payments would no longer be required to keep the coverage in effect for the next three years and Mr. and Mrs. Appling continued to send the amount of the premium to the S & L each month thereafter. These unearned and unnecessary premium payments were not returned to them by the S & L. They were placed in an "excess cash" account established for Mrs. Appling and her husband by the S & L. The S & L did not, however, inform Mrs. Appling or her husband of the creation and existence of their "excess cash" account.

The eighteen-year term policy expired in 1982. Again, the S & L did not inform Mrs. Appling or her husband of the expiration of the policy and the S & L continued to receive purported premium payments from them each month. The S & L merely continued to place these monthly payments in the "excess cash" account that it had set up. Mrs. Appling's husband died in 1984. When she demanded that the S & L pay her $10,000 as the beneficiary of her husband's insurance policy, the S & L informed her that there was no such policy in existence and that the funds in the "excess cash" account represented the full amount to which she was entitled. Mrs. Appling, in her individual capacity and in her capacity as administratrix of her husband's estate, brought this suit, alleging that the S & L had fraudulently or negligently led her and her husband to believe that an insurance policy existed whereby the life of the latter was insured for $10,000. She sought $10,000 as general damages, as well as punitive damages and attorney's fees. The S & L answered, denying the material allegations of Mrs. Appling's complaint. The case came on for jury trial. At the close of Mrs. Appling's evidence, the S & L moved for a directed verdict. The trial court granted the S & L's motion and directed a verdict in its favor. Mrs. Appling appeals from the judgment entered on the directed verdict.

1. " '(W)here one undertakes to procure insurance for another,

and is guilty of fraud or negligence in his undertaking, he is liable for loss or damage to the limit of the amount of the agreed policy.' [Cit.]" *Spurlock v. Commercial Banking Co.*, 138 Ga. App. 892, 899 (II) (227 SE2d 790) (1976), aff'd 238 Ga. 123 (231 SE2d 748) (1977). However, this is not a case wherein the S & L agreed that it would undertake to secure and maintain life insurance covering the life of Mr. Appling and the evidence of record conclusively shows that the S & L was not Mr. and Mrs. Appling's general agent for insurance matters. What the evidence does show is that Mrs. Appling's husband applied for his own mortgage life insurance in 1964 and he was issued a policy which comported in all respects with his application. The S & L was, at most, Mr. and Mrs. Appling's agent only for the acceptance and forwarding of premiums for the policy that Mr. Appling had obtained in 1964.

Moreover, even if we were to assume that the S & L had agreed to secure life insurance covering the life of Mrs. Appling's husband, this would still not be a case wherein the S & L negligently or fraudulently failed ever to do so. Compare *Carrollton Fed. &c. Assn. v. Young*, 165 Ga. App. 262 (299 SE2d 395) (1983). Mrs. Appling's husband was continuously insured from 1964 throughout the applicable eighteen-year term, and he died after the policy had expired. It appears that Mr. and Mrs. Appling were under the impression that, since a policy of insurance affording $10,000 in coverage had originally been issued, the life of Mr. Appling would at all times thereafter be insured for $10,000 in return for the payment of a monthly premium. However, a simple reading of the policy itself would have shown that it was merely a decreasing term life policy, whereby a steadily decreasing amount of coverage would be provided over an eighteen-year term which expired in 1982. It is true that the policy was never read by either Mr. or Mrs. Appling, because, at the election of Mr. Appling, possession of the policy had been retained by the S & L. It is, however, undisputed that the policy was at all times available for either Mrs. Appling or her husband to have retrieved or to have reviewed. They "knew that the policy was [in appellee's possession] and that [they] could have examined it. . . ." *King v. Brasington*, 252 Ga. 109, 111 (2) (312 SE2d 111) (1984). Accordingly, even if we were to assume that the S & L had been Mr. and Mrs. Appling's agent for the procurement of insurance, in order for Mrs. Appling to recover, she must show why neither she nor her husband read the policy so as to discover that the latter's life was not insured thereunder for $10,000 at the time of his death. " 'A party who can read must read, or show a legal excuse for not doing so.' [Cit.]" *Hart v. Trust Co. of Columbus*, 154 Ga. App. 329, 330 (268 SE2d 384) (1980).

The law recognizes that an intentional misrepresentation as to coverage may excuse a failure to read a policy. "Where an agent in-

tentionally misrepresents the existence of coverage or the extent of coverage an action in tort will lie and the insured's claim may not be defeated by his failure to examine and reject the policy. [Cits.] In order for [such a] verdict to stand [in this case] there must be some evidence of fraud or misrepresentation on the part of [the S & L]. . . . [E]vidence [which] shows only [a] misunderstanding or . . . negligence rather than fraud or misrepresentation [on the part of the S & L will not excuse the Applings' failure to read the policy]." *King v. Brasington*, supra at 110 (1). There is no evidence that Mrs. Appling or her husband was ever told by any employee of the S & L that the latter's life was and would thereafter continue to be insured for $10,000. Mrs. Appling was only told that, upon her husband's death, she would be entitled to the difference, if any, between the unpaid balance of the loan and the amount of coverage that was available under the policy. This was an entirely true statement. Mrs. Appling merely assumed that $10,000 was the amount of afforded coverage that would continuously be available under the policy. Thereafter, at the time of the actual loan payoff, Mrs. Appling was also told by an employee of the S & L that, by continuing to make premium payments, she could keep the policy in effect. However, this too was an entirely true statement. By continuing to make the required premium payments after the loan payoff in 1977, the life of Mrs. Appling's husband would continue to be insured for a steadily decreasing amount until the policy finally expired in 1982. Neither Mr. nor Mrs. Appling was ever informed by any employee of the S & L that, by merely continuing to make the premium payments, they would thereby secure $10,000 in continuous coverage on the life of Mr. Appling. That Mr. or Mrs. Appling failed to know that the life of the latter was, pursuant to his own application, insured under a policy which provided only decreasing eighteen-year term coverage rather than coverage of some other form and duration was, under the evidence, attributable solely to the failure to read the policy and not to any fraud or misrepresentation on the part of appellee. Mr. and Mrs. Appling simply chose to rely upon their own mistaken assumptions as to the coverage provided on the life of Mr. Appling rather than upon the reading of the actual policy. Those mistaken assumptions were not created by the misrepresentation or fraud of the S & L and the S & L did not prevent either Mr. or Mrs. Appling from reading the policy.

Mrs. Appling urges that, if the S & L did not intentionally create the mistaken assumptions as to the existence and extent of coverage on her husband's life, then the S & L negligently reinforced those mistaken assumptions as to that coverage. Under the evidence, the S & L gave the appearance of continuing to accept the purported premium payments, which it in fact credited to an "excess cash" ac-

count rather than to return to Mrs. Appling and her husband. However, even assuming that it was negligent for the S & L, in its capacity as agent for the forwarding of premiums for the 1964 policy, to retain the post-1979 payments submitted to it and to place those payments in an "excess cash" account rather than to return them as unearned and unnecessary premium payments, mere negligence on the part of the defendant will not authorize a recovery for the non-existence of such insurance coverage as would have been revealed to the plaintiff by a simple reading of the policy. See *King v. Brasington*, supra. Had the policy been read, it would have been known that it was not necessary to continue to send any premiums after 1979. Accordingly, in urging that the S & L was negligent in failing to provide information as to the extent of Mr. and Mrs. Appling's obligations with regard to the payment of post-1979 premiums, Mrs. Appling is, in effect, urging that the S & L was negligent in failing to undertake to protect the Applings from the consequences of their own failure to perform a duty which the law imposed upon them. Under these circumstances, Mrs. Appling may assert, as against the S & L, the right to a return of the premium payments that were mistakenly sent to the S & L. See generally *Cloppas v. C & S Bank of Albany*, 95 Ga. App. 365, 368 (1) (98 SE2d 153) (1957). Mrs. Appling cannot, however, recover from the S & L the amount of $10,000 in anticipated but non-existent insurance coverage by asserting that the S & L negligently reinforced mistaken assumptions as to the existence of such coverage. " '[T]he evidence demands a finding that [Mr. and Mrs. Appling] failed to comply with [their] legal duty to examine [the] contract, observe what coverage is provided . . . , and, if the coverage was not correct, either reject the policy as written when tendered or renegotiate [the] contract with the insurer[.]' [Cits.] There being no fraud or any other reason shown by law in the case sub judice for [Mr. or Mrs. Appling] to fail to read the policy or depend entirely upon the [the S & L's] agent[s] we find no basis here from the facts [in evidence] to deal with this case any differently from those . . . cases [which hold that such a failure to read the insurance policy is a bar to recovery when the coverage expected is not the coverage actually afforded]. As in those cases, [Mr. and Mrs. Appling] was not only free to examine the contract, [they were] under a duty to do so; and if [they] had done that [they] would have observed just what coverage [the] policy provided." *Barnes v. Levenstein*, 160 Ga. App. 115, 116 (286 SE2d 345) (1981).

2. The evidence of record conclusively shows that Mrs. Appling has no viable claim based upon the S & L's alleged capacity as the agent of her or her husband with regard to the insurance coverage on the life of the latter. If the S & L has any liability to Mrs. Appling, it is only in its capacity as a financial institution. If the S & L's failure

to apprise the Applings of its post-1979 retention of the sums sent to it as premiums and its failure to apprise them of its creation of the "excess cash" account for those sums constituted a breach of a duty owed in its capacity as a financial institution, then Mrs. Appling would be entitled to recover such damage as she suffered as the proximate result thereof. However, Mrs. Appling did not advance this theory of recovery at trial and introduced no evidence that the S & L's post-1979 actions were in breach of any duty that it owed in its capacity as a financial institution or that, were it not for those post-1979 actions, $10,000 in insurance coverage could and would have been secured on the life of her husband. Mrs. Appling sought to recover solely on the theory that the S & L was the Applings' agent for the procurement and maintenance of $10,000 in insurance coverage on the life of her husband. As discussed in Division 1, the evidence would not authorize a recovery under this theory and the trial court did not err in granting a directed verdict in favor of the S & L.

*Judgment affirmed. Birdsong, C. J., Deen, P. J., Pope and Beasley, JJ., concur. McMurray, P. J., Banke, P. J., Sognier and Benham, JJ., dissent.*

BANKE, Presiding Judge, dissenting.

"Where an agent intentionally misrepresents the existence of coverage or the extent of coverage an action in tort will lie and the insured's claim may not be defeated by his failure to examine and reject the policy." *King v. Brasington*, 252 Ga. 109, 110 (1) (312 SE2d 111) (1984).

The evidence in the present case reveals that the appellee savings and loan association contacted the appellant and her husband repeatedly about the availability of the mortgage life insurance coverage after the loan was already in existence and subsequently collected as a commission 15 percent of all the premium payments sent to the insurer. Such evidence provides ample support for a determination that the appellee was acting as an agent of the appellant and her husband for the purpose of procuring the insurance coverage. See generally *National Property Owners Ins. Co. v. Wells*, 166 Ga. App. 281 (2) (304 SE2d 458) (1983). As the appellee's subsequent conduct in knowingly continuing to accept premium payments from the appellant and her husband for a period of several years after the insurance coverage had terminated could certainly be viewed as a fraudulent misrepresentation on its part that *some* amount of coverage continued to be in force during that period, it follows that the failure of the appellant and her husband to read the policies does not constitute an absolute defense to the present action. See *King v. Brasington*, supra.

Moreover, even if the appellee's conduct in accepting and retaining the premium payments after the termination of the coverage was

determined by a jury to have been merely negligent rather than fraudulent, the appellant and her husband could nevertheless be excused for their failure to examine the policies based on the fact that the appellee never transmitted the policies to them. See *Allstate Ins. Co. v. Reynolds*, 138 Ga. App. 582, 585 (227 SE2d 77) (1976); *Guthrie v. Gen. Motors Acceptance Corp.*, 172 Ga. App. 260, 261 (322 SE2d 752) (1984). The Supreme Court's decision in *King v. Brasington*, supra, does not require a contrary conclusion, because the agent in that case did at least furnish a copy of the policy to the insured's assignee. Where, as in the present case, the assignee/beneficiary of the policy and the agent for its procurement were one and the same, it would work a gross injustice to hold that the agent had insulated itself from liability to the insured by in effect transmitting the policy to itself.

I would hold that the trial court erred in granting the appellee's motion for directed verdict.

I am authorized to state that Presiding Judge McMurray, Judge Sognier and Judge Benham join in this dissent.

DECIDED DECEMBER 3, 1987 —
REHEARING DENIED DECEMBER 17, 1987 —

*William A. Neel, Jr.*, for appellant.
*Walter J. Matthews*, for appellee.